IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ERIC KAY | No. 4:20-cr-269-Y |

GOVERNMENT'S NOTICE OF INTENT TO OFFER EVIDENCE
POTENTIALLY RELEVANT TO FEDERAL RULE OF EVIDENCE 404(b)

The government notifies the defendant that the government intends to offer evidence at trial of the following issues.  Although the government believes some of these acts are intrinsic to the indictment, it gives notice of them here pursuant to Federal Rule of Evidence 404(b), out of an abundance of caution.

## FACTUAL BACKGROUND

In October 2020, the government charged defendant Eric Kay (Kay) in a two-count Indictment with conspiracy to distribute a controlled substance—fentanyl—and with distributing a controlled substance—fentanyl—that resulted in the death of T.S.  *See* Dkt. No. 12.  The charges stemmed from Kay's distribution of fentanyl to T.S. on June 30, 2019, which ultimately caused the death of T.S., who was only 27 years old.

On July 1, 2019, T.S. was found dead in his assigned hotel room (Room 469) at the Hilton hotel located at 1400 Plaza Place, Southlake, Texas.  An autopsy was conducted, and the cause of death was listed as mixed ethanol, fentanyl, and oxycodone intoxication with terminal aspiration of gastric contents.  T.S. was found in his hotel room just after 2:00 pm, and at approximately 2:30 pm, Southlake Police Department

arrived at the Southlake Hilton hotel in response to an emergency call.  Upon arrival, Southlake Police Department detectives observed T.S. lying face down on the bed and indications that controlled substances had been consumed—namely, a black iPad case on the desk with a white powdery residue on it, a Hilton room card that appeared to have the same white powdery residue as the iPad case, and part of a pen that had been taken apart and also had the same white powdery residue inside it.  Detectives also found a prescription bottle for Indomethacin ER 75, which is an anti-inflammatory medication.  Inside the prescription bottle were five round pink pills labeled K/56 and one round blueish pill with "M" on one side and "30" on the other side.  The pills were submitted for testing, and it was determined that the five pink pills were oxycodone and the one blueish pill was fentanyl.

Kay was the Communications Director for the Los Angeles Angels (Angels) baseball team and had worked for the organization for over 15 years as of June 30, 2019.  Kay was travelling with the Angels on June 30, 2019, to the Dallas-Fort Worth area for the Angels game against the Texas Rangers.  However, June 30, 2019, was not the first time that Kay had distributed drugs to T.S.  Indeed, beginning in at least 2017, Kay was obtaining and distributing controlled substances, including oxycodone, to Major League Baseball players within the Angels organization.  The evidence at trial will show that Kay would obtain these pills from a variety of sources, purchase them for himself and others, and then distribute the pills to T.S. and others.  On June 30, 2019, however, Kay provided T.S. with counterfeit oxycodone pills.  T.S. ingested the pills provided by Kay and in short manner passed away from the effects of the fentanyl found in the counterfeit pills.

The government plans to introduce evidence that Kay would obtain controlled substances from multiple sources and then distribute them to T.S. and others as well as use them himself. This evidence is relevant to, and intertwined with, both counts levied against Kay in the indictment. As one source of supply, Kay would communicate and negotiate with individuals on a website called OfferUp. As detailed more fully below, in 2019, Kay was utilizing OfferUp, an online marketplace, to obtain oxycodone pills. On at least one occasion, Kay asked an individual to meet him at Angel Stadium because he could not leave work to pick up the pills. The OfferUp communications also demonstrate that Kay knew that oxycodone pills could be counterfeit and could contain fentanyl and was inquiring as to the legitimacy of the oxycodone pills in June 2019, just weeks before he distributed the counterfeit pills to T.S.

The government also anticipates introducing evidence that as far back as 2017, Kay was obtaining oxycodone pills to distribute to Angels players. The evidence will be in the form of witness testimony (from individuals who received pills from Kay) and from communications between Kay, T.S., and other players. The government will also introduce evidence that the oxycodone pills Kay distributed were blue in color, were referred to as "blue boys" or "blues" and that blue oxycodone pills would contain markings of M and 30, just as the one found in T.S.'s hotel room. This evidence will be in the form of factual and expert witness testimony as well as communications between Kay and others.

Finally, the government anticipates introducing evidence of Kay's past drug use and evidence of traces of fentanyl found in items in his desk drawer at Angels stadium.

This evidence will come in through witness testimony and exhibits.

As laid out more fully below, much of this evidence is intrinsic to the counts charged, as it completes the story of Kay's conspiracy and distribution, providing context of the various manners and methods in which Kay would obtain, distribute, and use oxycodone.  Even if the evidence is not intrinsic to the conspiracy and distribution charges against the defendant, the evidence is proper under Rule 404(b) because the evidence shows Kay's motive, opportunity, intent, preparation, plan, knowledge, absence of mistake, and lack of accident.

## RELEVANT LAW

Federal Rule of Evidence 404(b) provides that evidence "of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," although such evidence may be admissible "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(1)-(2).  *See also United States v. Smith*, 804 F.3d 724, 735 (5th Cir. 2015).

As an initial matter, however, Rule 404(b) is only implicated when the offered evidence is extrinsic; evidence intrinsic to the charged offense does not implicate the rule. *United States v. Crawley*, 533 F.3d 349, 353-54 (5th Cir. 2008).  "Other act evidence is 'intrinsic' when the evidence of the other act and the evidence of the crime charged are 'inextricably intertwined' or both acts are part of a 'single criminal episode' or the other acts were 'necessary preliminaries' to the crime charged." *United States v. Rice*, 607

F.3d 133, 141 (5th Cir. 2010) (quoting *United States v. Williams*, 900 F.2d 823, 825 (5th Cir. 1990)). "Intrinsic evidence is admissible to complete the story of the crime by providing the immediate context of events in time and place, and to evaluate all of the circumstances under which the defendant acted." *Id.* (internal citations and quotations omitted). Additionally, when the acts at issue were committed in furtherance of a charged conspiracy, those acts are part of the act charged and therefore qualify as intrinsic evidence. *United States v. Ceballos*, 789 F.3d 607, 621 (5th Cir. 2015). On the other hand, "when evidence of a defendant's uncharged crimes, wrongs, or other acts is *extrinsic* to the offense, the admission of that evidence is limited under Rule 404(b)." *Id.* (emphasis in original).

In those instances where the acts are found to be extrinsic to the offense and implicate Rule 404(b), as a threshold matter, the evidence of an uncharged crime or "other act" must be sufficient to support a finding that the crime or act actually occurred. *United States v. Gutierrez-Mendez*, 752 F.3d 418, 423-24 (5th Cir. 2014) (citing Fed. R. Evid. 104(b)). If evidence of the crime or act is sufficient, its admissibility under Rule 404(b) then hinges on whether (1) it is relevant to an issue other than the defendant's character, and (2) it "possess[es] probative value that is not substantially outweighed by its undue prejudice" under Federal Rule of Evidence 403. *United States v. Beechum*, 582 F.2d 898, 911 (5th Cir. 1978) (en banc).

Notably, courts are more willing to allow the admission of extrinsic evidence in cases involving a conspiracy charge in order to prove the intent element of the charged crime. *See United States v. Parziale*, 947 F.2d 123, 129 (5th Cir.1991), *cert. denied*, 503

U.S. 946 (1992).  In fact, "[t]he mere entry of a not guilty plea in a conspiracy case raises the issue of intent sufficiently to justify the admissibility of extrinsic offense evidence." *Id.*; *see also United States v. Prati*, 861 F.2d 82, 86 (5th Cir. 1988) (same); *United States v. Gordon*, 780 F.2d 1165, 1174 (5th Cir. 1986) (same).

In undertaking the analysis of the second prong of the *Beechum* test, "the task for the court ... calls for a common-sense assessment of all the circumstances surrounding the extrinsic offense." *United States v. Richards*, 204 F.3d 177, 200 (5th Cir. 2000).  Several factors affect the probative value of the evidence, including "the extent to which the defendant's unlawful intent is established by other evidence, the overall similarity of the extrinsic and charged offenses, and the amount of time that separates the extrinsic and charged offenses." *United States v. Chavez*, 119 F.3d 342, 346–47 (5th Cir. 1997). Importantly, the risk of unfair prejudice is substantially lowered by a district court's limiting instruction.  *Crawley*, 533 F.3d at 355.

## EVIDENCE AT ISSUE

*Issue No. 1: Eric Kay's communications with drug distributors on OfferUp.*

The government intends to introduce evidence that Eric Kay used the online marketplace OfferUp to obtain controlled substances (specifically, oxycodone pills). During this investigation, the government found emails on Kay's work account (eric.kay@angels.com) between Kay and individuals on the OfferUp website suggesting that Kay used OfferUp to locate distributors of oxycodone pills.  The government was recently able to obtain the content of the messages Kay was exchanging on OfferUp. During the 2019 season, specifically from March 2019 through June 2019, Kay

communicated with approximately nine different OfferUp User IDs in a manner that indicated he was attempting to obtain controlled substances from individuals on the website. Each of the OfferUp communications at issue have listings that include "M30," "Roxy", "Blue", or some combination of these terms. For the year 2019, the relevant communications range from March 11, 2019 through July 11, 2019. The messages also indicate that Kay was asking individuals to meet him at Angel Stadium, offering Angel memorabilia to obtain the pills, and consistently inquiring into the legitimacy of the pills. The following are examples of Kay's communications on OfferUp:

<u>June 8-11, 2019, with User named Danny</u>

On June 8, 2019, in response to an account posting for "M30 shirt," Kay had the following exchange with Danny:

| Kay:[1] | Hi, is this still available? |
|---|---|
| Danny: | Always |
| Kay: | Ok nice. Any chance u can get to Angel Stadium? Where I work. Could leave u tickets for the game if u wanted |
| Kay: | My Bad. That |
| Kay: | Sounds weird. Ha. I just can't leave work tonight |

Kay exchanged messages with Danny again on June 11, 2019 as follows:

| Kay: | Circling back if u have these. Happy to come ur way |
|---|---|
| Danny: | That sounds dope |

---

[1] The OfferUp account information received indicated that the account was activated December 27, 2016 and that the name associated with the User Account information is "Walt" (no last name provided). The email and phone number associated with the account on the User Account details, however, are attributable to Kay.

**Government's 404(b) Notice – Page 7**

  Danny:  Lol

<u>June 9, 2019, with User named Morgan</u>

  On June 9, 2019, in response to an account posting for "BLUE ROXY SHORTS 30," Kay had the following exchange with Morgan:

  Kay:  Hi, is this still available?

  Kay:  U around?

  Morgan:  Let me double check the quantity

  Morgan:  How many?

  Kay:  $200 worth

  Kay:  Can u meet now?

  Kay:  LMN

<u>April 13, 2019, with User named Enrique Gardea Phucc Yuuu (Yuuu)</u>

  On April 13, 2019, in response to an account posting for "M30 LEGO pieces , made in the USA !," Kay had the following exchange with Enrique Gardea Phucc Yuuu (Yuuu):

  Kay:  Hi, can you meet today?

  Yuuu:  Sup how many?

  Kay:  Prolly 8 but a lot of bunk sh*t out there. Can I taste one first?

  Yuu:  Ok {?}Naw trust these fire {?}I been hearing a lot about those nasty ones that either burn or taste like perfume . Trust me these are the best ones rn

  Kay:  Ok no fentanyl right?

  Yuuu:  Idk {?}I think most of them are bro

Kay: Have u had this batch?

Yuuu: What you mean ?{?}I always get the same batch and everyone comes back and says the same {?}Things these are the stronger ones

Kay: Ok cool. Where u wanna meet?

Kay: U there?

Yuuu: How many ?

Yuuu: What's your snapchat ?

Kay: Don't have one. Where u at? 8

Yuuu: You have Instagram ?

Kay: Yes. erickay21

The exchange continues with Yuuu providing a meet location and Kay indicating when he was arriving and the type of car he was driving. Kay also reaches out to Yuuu on April 20, 2019 and April 21, 2019.

Even before these June and April exchanges, Kay was attempting to obtain oxycodone on OfferUp. For example:

<u>March 22-24, 2019, with User named Sharky</u>

Beginning on March 22, 2019, in response to an account posting for "Roxy shirts size m30 color blue," Kay had the following exchange with Sharky:

Kay: 10 for 240 cool?

…

Sharky: Usually 25$ bro just this time

Kay also inquires as to the quality and legitimacy of the pills:

Kay: Ok cool. Pharm grade? No fet. Sh*t is scary

>   Sharky:    Real deal bro fuk that sh*t I dont fuk around

Subsequent to an exchange wherein it appears that Kay received pills from Sharky, Kay then offers him an autographed baseball in exchange for pills:

>   Kay:       U have a son? Could hook him with a signed Trout ball for a trade if U want?
>
>   Sharky:    We dodger fans my boi lol

There are several other messages in March 2019 wherein Kay attempts to confirm that the pills were legitimate and did not contain fentanyl.

Communications like the above go directly to the conspiracy at issue in this case and to Kay's pattern of obtaining pills. The government has alleged Kay was in a conspiracy to obtain and distribute oxycodone pills and the government anticipates the evidence at trial will show that Kay procured the pills he distributed to T.S. during the workday on June 30, 2019, shortly before leaving for the team's Texas road trip. This evidence demonstrates that during the course of this conspiracy, Kay would use his work time and his work location, when he was in proximity to the players, to obtain controlled substances. While the government anticipates that phone records from the days leading up to June 30, 2019, as well as on June 30, 2019, will demonstrate additional sources of supply for Kay, including individuals he spoke to on the phone, the OfferUp evidence is part of the story as well because it shows that Kay was involved in a conspiracy with several individuals and was obtaining drugs in several ways. In other words, this evidence is intrinsic to the conspiracy charged.

Even if the Court finds that these communications are not intrinsic to the conspiracy, they are admissible under Rule 404(b). These OfferUp communications are

relevant to showing Kay's motive, opportunity, intent, plan, knowledge, absence of mistake, and lack of accident.  First, they demonstrate that Kay was motivated to procure pills not only for others, but also for himself.  The number of pills he was procuring— eight and ten—are consistent with the government's anticipated evidence at trial.  That is, the government anticipates the evidence will show that T.S. and others would often seek a small number of pills and that Kay would get a few pills for another individual and a few pills for himself.  These communications demonstrate Kay's motive and intent to obtain oxycodone pills and his knowledge that he was obtaining oxycodone pills.  This evidence is not unduly prejudicial because "proof of prior drug activities is more probative than prejudicial" in proving Rule 404(b) exceptions such as knowledge or intent.  *United States v. Kinchen*, 729 F.3d 466, 474 (5th Cir. 2013).

   Second, the communications are relevant to demonstrating Kay's opportunity, plan, and intent to obtain oxycodone pills.  The government anticipates the evidence will show that Kay obtained the pills while at Angel Stadium on June 30, 2019, and these communications are relevant to showing that Kay would communicate with individuals during the workday and even ask them to deliver oxycodone pills to Angel Stadium, showing that he had the opportunity to obtain the pills he distributed to T.S. on June 30, 2019.  Similarly, the communications show Kay's plans, and his knowledge and intent to obtain oxycodone pills using multiple sources of supply and to do so while at Angel Stadium.  In fact, the communications demonstrate Kay's *modus operandi*—a pattern of obtaining oxycodone pills from sources at Angel stadium—which is directly relevant to a showing of knowledge and intent.  *United States v. Williams*, 99 F.2d 823, 826 (5th Cir.

1990).

The communications are also relevant because they demonstrate that Kay had knowledge that the pills could be counterfeit and could contain fentanyl. While it is not an element that the government must prove Kay knew the oxycodone pills he distributed contained fentanyl, it is nonetheless relevant to the charged crime. The government anticipates the defense will argue or insinuate that Kay is not at fault because he did not know the oxycodone pills contained fentanyl. While not a legal element, these communications demonstrate that Kay not only knew that it was risk that the oxycodone pills could be counterfeit and contain fentanyl, but also that he knew fentanyl was dangerous and knew the risks associated with fentanyl. Evidence such as this can be relevant and admissible under Rule 404(b), even if it is not an element that the government must prove. *See Kinchen*, 729 F.3d at 472 (noting that even though "motive is not an ultimate issue" in a case, it can be part of the story and provide context to the events in question).

For all of these reasons, Kay's activity on OfferUp is also admissible under Fed. R. Evid. 404(b), which provides that "evidence of other crimes, wrongs, or acts" may "be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." As Courts have routinely stated, Rule 404(b) is a "rule of inclusion rather than exclusion." *United States v. Cruz*, 326 F.3d 392, 395 (3d Cir. 2003). *See also United States v. Andersen*, 374 F.3d 281, 288 (5th Cir. 2004) ("Rule 404(b) is a rule of inclusion"). In other words, a court may admit prior crimes or bad acts evidence "if relevant for any other purpose than to show a mere

propensity or disposition on the part of the defendant to commit the crime." *United States v. Johnson*, 199 F.3d 123, 128 (3d Cir. 1999) (quoting *United States v. Long*, 574 F.2d 761, 766 (3d Cir. 1978)). Moreover, to the extent any defendant argues that the evidence is so prejudicial as to violate Rule 403, this risk of unfair prejudice is substantially lowered by a district court's limiting instruction, to which the government would agree. *Crawley*, 533 F.3d at 355. Because evidence that Kay repeatedly utilized OfferUp to try to obtain oxycodone pills (often while working at Angel stadium) and repeatedly inquired into the pills' legitimacy is relevant to proving Kay's motive, knowledge, intent, and opportunity to obtain pills, it is admissible under Rule 404(b).

> **Issue No. 2: Eric Kay's distribution of oxycodone pills to individuals other than T.S.** The government intends to introduce evidence at trial that since 2017, Kay obtained oxycodone pills for several Major League Baseball players and distributed those pills to them. More specifically, the government anticipates presenting testimony of approximately five players who received oxycodone from Kay in 2017, 2018, and/or 2019. The evidence will also demonstrate that Kay often coordinated the distribution through text messages or through conversations involving the victim, T.S. This witness testimony will in many instances be corroborated by text message communications.

This evidence of drug distribution by Kay to other Major League Baseball players is "inextricably intertwined" with the charges in the indictment and is thus admissible under Federal Rule of Evidence 402. This is true for a variety of reasons. It shows that for the duration of the conspiracy—beginning in 2017 through T.S.'s death—Kay was obtaining and distributing oxycodone pills. The witnesses will testify to receiving

different amounts from Kay—with some witnesses receiving just two to three pills while others would ask for up to 20 pills—which is relevant to demonstrating that Kay would obtain different amounts and had sources of supply, or co-conspirators, from whom he would obtain those pills. Moreover, this evidence is essential to explaining the background of the distribution that led to T.S.'s death. *United States v. Torres*, 685 F.2d 921, 925 (5th Cir. 1982). That is, the evidence shows that it was not other individuals who were distributing oxycodone to the players, but that it was Kay who was the players' singular source for oxycodone pills. In other words, this evidence is necessary to "complete the story of the crime by proving the immediate context of events in time and place." *See Rice*, 60 F.3d at 141.

If the Court determined that this evidence was not inextricably intertwined with the charged offense, it would nonetheless be admissible under Federal Rule of Evidence 404(b) as evidence of intent, plan, knowledge, and motive. This evidence demonstrates that Kay consistently intended and planned how to obtain pills and provide them to the players. Moreover, it will show that Kay was the individual who was distributing the oxycodone pills to these players. The players will testify that they did not receive the pills from another member of the Angels organization. Evidence will also demonstrate that Kay was motivated to obtain these pills because Kay could himself use some of the pills that he obtained for the players. It therefore provides context and background to the distribution at issue in the indictment. Moreover, a court may admit prior crimes or bad acts evidence "if relevant for any other purpose than to show a mere propensity or disposition on the part of the defendant to commit the crime." *Johnson*, 199 F.3d at 128.

Where, as here, the government must prove intent in a case involving a conspiracy charge, the Fifth Circuit has routinely upheld the admission of extrinsic acts to show intent (or other permissible items). *See Parziale*, 947 F.2d at 129; *Prati*, 861 F.2d at 86; *Gordon*, 780 F.2d at 1174.

For all of these reasons, Kay's prior distribution of oxycodone to Major League Baseball players is admissible. It is intrinsic to the crimes charged in order to complete the story of distribution and provide background for the distribution and conspiracy. Even if the evidence is not intrinsic, it is relevant and admissible under Rule 404(b) to show Kay's motive, plan, intent, knowledge, and opportunity to distribute oxycodone pills.

*Issue No. 3: Eric Kay's prior drug use and treatment for addiction to oxycodone in April 2019.* The evidence at trial will show that on or about April 21, 2019, Kay was taken home from Angel Stadium by a co-worker because Kay was behaving in an erratic manner. It was later determined that Kay had overdosed, likely on oxycodone, and had been transported to the hospital. After his hospital admission, Kay entered into a drug rehab program, where he stayed for approximately one month. The evidence at trial will show that during the month of June 2019, Kay did not travel with the Angels organization as part of his "recovery" but that, per the OfferUp emails above he was working to obtain pills from individuals on the OfferUp website. The evidence of Kay's prior drug use and April/May 2019 drug rehabilitation program is relevant to the case at hand and inextricably intertwined with the crimes charged in the indictment. Kay's drug use and treatment provide background and complete the story. This is especially true because at

one point Kay told a member of the Angels organization that while he went to T.S.'s room on the evening of June 30, 2019, he did not use any drugs with T.S. because Kay was in recovery.  To the extent the defendant intends to rely on his recovery as some sort of element of defense, this evidence is clearly intertwined with the evidence at hand.

Even if the Court finds that the evidence is not intrinsic, it is relevant and admissible under Rule 404(b).  The evidence that Kay was a drug user is relevant to showing Kay's motive and opportunity to obtain oxycodone pills.  The timing of his overdose and hospital admission is also relevant to the case because, as noted above, he was attempting to obtain oxycodone pills from a user on OfferUp on April 21, 2019, while he was at Angel stadium.  The timing of these two events work together to again demonstrate Kay's *modus operandi* of obtaining pills.  For all of these reasons, this evidence is relevant and should be admitted.

**Issue No. 4: Drug residue, including indications of fentanyl, found in items in Eric Kay's desk drawer.**  In December 2019, law enforcement performed a search of Kay's office at Angel Stadium pursuant to a federal search warrant.  During that search, law enforcement seized two items that appeared to have a white reside on or in them from Kay's desk at Angel stadium: (1) a razor blade holder with a razor blade and sleeve; and (2) a small, metal cylinder with a screw cap.  With respect to the razor blade, a chemist will testify that powdery residue found on the razor blade tested positive for oxycodone[2] and that the residue also had indications of hydrocodone present and indications of

---

[2] The residue also tested positive for acetaminophen, which is not a controlled substance, but is found in conjunction with oxycodone in several pills.

Government's 404(b) Notice – Page 16

fentanyl ions present.³  With respect to the metal cylinder, a chemist will testify that a powdery residue found in the cylinder tested positive for acetaminophen and that the residue also had indications of hydrocodone, oxycodone, and fentanyl.

      This evidence is intrinsic to the charges at hand for all of the reasons detail above; that is, they again demonstrate that Kay was obtaining and storing pills with him at Angel stadium.  Not only was it oxycodone pills, but it was residue and indications associated with the exact types of drugs found in T.S.'s system at the time of his death.  However, even if the evidence is not found to be intrinsic, it is also relevant and admissible under Rule 404(b) for many of the reasons detailed above.  The evidence that Kay had drug residue in his desk drawer is relevant to showing Kay's knowledge and intent of obtaining pills at work, as detailed above, and is for all of these reasons admissible and relevant under Rule 404(b).

---

³ The test results also demonstrated indications of other controlled substances, including tramadol and cocaine, but the government would limit its evidence to those controlled substances at issue in this case.

**Government's 404(b) Notice – Page 17**

## **CONCLUSION**

The government respectfully requests a ruling from the Court before trial regarding the admissibility of the above-described categories of evidence.

Respectfully submitted,

PRERAK SHAH
Acting United States Attorney

*s/ Lindsey Beran*
LINDSEY BERAN
Assistant United States Attorney
Texas State Bar No. 24051767
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone: 214-659-8600
Facsimile: 214-659-8805
Email: Lindsey.Beran@usdoj.gov

*s/ Errin Martin*
ERRIN MARTIN
Assistant United States Attorney
Texas State Bar No. 24032572
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone: 214-659-8600
Facsimile: 214-659-8805
Email: Errin.Martin@usdoj.gov

*s/ Jonathan Bradshaw*
Jonathan Bradshaw
Assistant United States Attorney
Colorado Bar No. 43838
1100 Commerce Street, Third Floor
Dallas, Texas 75242
Telephone: (214) 659-8600
jonathan.bradshaw@usdoj.gov

<u>Certificate of Service</u>

On August 20, 2020, I electronically submitted the foregoing document with the Clerk of the Court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court, providing electronic notice of this document to opposing counsel of record.

<u>s/ Lindsey Beran</u>
LINDSEY BERAN
Assistant United States Attorney
